## JAMES HUNTINGTON, STATE'S ATTORNEY, *vs.* JOHN H. McMAHON AND OTHERS.

Certain liquors were seized with a view to condemnation under the statute. Two of the present respondents, *M* and *W*, appeared before the magistrate and claimed the liquors as their own, and on a decision against them appealed to the District Court. After the appeal and before the session of the appellate court they obtained from the third respondent, who was a magistrate, a writ of replevin, upon which the fourth respondent took the liquors by force from the officer in whose custody they were and delivered them to *M* and *W*. Upon proceedings for contempt of the appellate court, instituted in that court by the State's Attorney, all the respondents were held guilty. Held upon error—

1. That the cause was pending at the time the liquors were replevied, before the appellate court.

2. That the liquors were sufficiently in the custody of that court, being held subject to its order.

3. That it did not affect the case that the acts were not committed in the presence of the court.

4. That the claimants of the liquor were not entitled to the writ of replevin under the statute which provides that it shall lie for property wrongfully detained and of which the party is entitled to the immediate possession.

Where liquors were thus held for adjudication upon proceedings averring probable cause for believing they were forfeited under the statute, the officer did not hold them in any sense wrongfully.

And the claimants could have no right to the immediate possession, since such a right would be inconsistent with the right of the court to hold them for adjudication.

The statute (Gen. Statutes, tit. 4, ch. 6, sec. 15,) which provides for the punishment of contempts committed in the presence of the court, leaves all other cases of contempt to be ascertained and punished according to the course of the common law.

The same principle which governs courts in enforcing their decrees by a judgment for contempt will justify them in the use of the same means to protect their jurisdiction in order that they may pass decrees.

Where the parties charged with the contempt have testified under oath that they acted in good faith and intended no disrespect to the court, it does not so far purge the contempt that no further proceedings can be had against them except a prosecution for perjury. The practice in this state is to receive other testimony and settle the whole question of contempt in one proceeding.

The respondents in such a proceeding for contempt are not entitled to a trial by jury.

The complaint filed by the State's Attorney for the contempt was demurred to by the respondents in the court below. Held that the judgment of the court overruling the demurrer was not a final judgment from which proceedings in error could be taken.

PROCEEDINGS for a contempt, in the District Court of Litchfield County, before *Fyler, J.*

Certain liquors had been seized and condemned in the town of Winchester, by proceedings before a justice of the peace, under the 5th section of the act with regard to intoxicating liquors. From this judgment John H. McMahon and Peter W. Wren, who claimed to own as partners a portion of the liquors and had appeared and been heard before the justice as such claimants, appealed to the District Court. After this appeal was taken and before the session of the appellate court, McMahon and Wren replevied the liquors claimed by them and took them out of the hands of the officer. The present proceeding was for a contempt in thus taking the liquors, and was brought against McMahon and Wren, the plaintiffs in the replevin suit, Patrick J. Leonard, a justice of the peace who issued the writ of replevin, James M. Chatfield, who served the writ as an officer, and John A. Hurley, who gave bond on the writ. The decree of the court, which states the proceedings before the court and finds the facts in the case, was as follows:—

Upon the petition and application of James Huntington, State's Attorney for said Litchfield County, filed in said District Court at the October term thereof, 1879, praying that John H. McMahon, Peter W. Wren, Patrick J. Leonard and John A. Hurley, all of the town of Bridgeport in Fairfield County, and James M. Chatfield of the town of Thomaston in said Litchfield County, might be made to appear before this court to show cause, if any they had, why they should not be dealt with for contempt in doing and committing the

acts named and set forth in said petition and application; and an order having been made by this court in the premises at said October term, which was duly served on each of said persons, they appeared in said court in compliance therewith at said October term, and said petition and application came by regular continuance to the January term of the court, when the parties again appeared, and the said respondents for answer to said petition and application entered a demurrer thereto as on file. And the respondents and said Attorney having been fully heard thereon, it was adjudged that said petition and application and the matters therein contained were sufficient in law; and thereupon the respondents, before answering over, filed their motion in error, which said motion the court overruled and required the respondents to answer over to said petition and application. Whereupon the respondents severally made answer to said petition and application as on file; to which said answers said State's Attorney made reply denying the truth of said answers as on file, and the parties were at issue thereon, as by said answers and reply on file appears; and thereupon the respondents made their motion to the court in writing, as on file, for a trial by jury on said issues of fact joined, but the court overruled and denied said motion and ordered the respondents to proceed to trial by the court without a jury; and the respondents and the State's Attorney were fully heard upon the facts, and the respondents, excepting Peter W. Wren, being severally sworn testified to the court and claimed that in taking the liquors or any part thereof set out in said petition and application they did not intend any disrespect to or contempt of this court or any other court, and, excepting said McMahon and said Wren, testified that they had no knowledge that said liquors were held by virtue of any seizure process for the purpose of condemnation; and all the respondents, except said Wren, testified that they did no more than they supposed they in good faith had a legal right to do; and thereupon the Attorney for the State offered to introduce the testimony of other witnesses, and the file of the appealed cause now in this court, entitled *State* v. *Gren-*

*nan's Liquors*, for the purpose of contradicting these statements of the respondents, and to show that they had such knowledge and did not act in good faith. To all this evidence the respondents objected, upon the ground that in proceedings for contempt of this character no such evidence is admissible. But the court overruled the objection and admitted the evidence.

Upon all the evidence offered, it is found that, on the 23d day of August, 1879, due and legal complaint was made in writing by three duly qualified residents of the town of Winchester under oath to Albert M. Beach, a justice of the peace for the county of Litchfield, residing at Winchester, that certain liquors described were kept in certain buildings in said town, which were described, to be sold contrary to and in violation of law; thereupon said justice issued his warrant to search the premises named in the application; the warrant was placed in the hands of Patrick H. Ryan, a duly qualified constable of the town, who on the 23d and 25th days of said August duly served the same at the premises named in the complaint, and seized and took into his possession the liquors described in his return made to said justice, and thereupon placed said liquors in the possession and care of Samuel B. Forbes, at Winchester, to securely keep the same for him as such constable. Said justice on the 25th day of August issued the notices required by law, directed to John Donovon and others, citing them to appear before him on the 13th day of September, 1879, at 9 o'clock in the forenoon, at his office in Winchester, then and there to show cause, if any they had, why the liquors and vessels so seized should not be adjudged a nuisance, which was duly served.

In pursuance of said notice a justice court was holden by said justice at Winchester, on the 13th day of September, when the respondents, John H. McMahon and Peter W. Wren, and also Gabriel Grennan of Winchester, not a respondent, appeared and were made parties defendant to the proceedings, and the said McMahon and Wren claimed the 22-gallon cask of rum; the two 23-gallon casks of whisky, the 20-gallon

cask · of whisky, and the 10-gallon cask of gin, as set forth in said warrant; and thereupon a hearing was had before said justice, and said liquors and all the liquors so seized were adjudged a nuisance; and thereupon said respondents McMahon and Wren, severally appealed from the decision of said justice court to this court, at the October term, 1879, which appeal was allowed, and said McMahon and Wren gave bonds with sureties as required by law; all of which appears by certified copies of said proceedings on file.

The court also finds that the appeal copies of said McMahon and Wren from the decision of the justice court in the proceedings for the seizure and condemnation of the liquors in question, were entered in this court at its October term, 1879, between the first and second openings thereof, on or about the 9th day of October, and that said cause is now pending in this court.

The court further finds that after said McMahon and Wren had taken their appeal from the judgment of the justice in the month of September, 1879, they instructed the respondent Leonard, who was then a duly elected and qualified justice of the peace for Fairfield County, to issue for them a process for the recovery of said liquors, and that said Leonard claimed to have issued such a process for the restoration of said liquors to the possession of said McMahon and Wren which he claimed at their request to have delivered for service to the respondent Chatfield, who then was a duly appointed and qualified sheriff's deputy for the county of Litchfield. Whether or not such process was a lawful one did not appear from the evidence introduced in court. Said Chatfield with said process, accompanied by said Leonard, went to the house of said Forbes, in Winchester, who had said liquors in his care and possession, and then and there on the 4th day of October, 1879, said Chatfield and Leonard forcibly took and carried away said liquors from and out of the possession of said Forbes, and the custody and jurisdiction of this court, and after retaining said liquors twenty-four hours delivered the same to the said McMahon and Wren, all by virtue of said process. Said Forbes was on said 4th day of October

lawfully holding said liquors under and by virtue of authority of said seizure proceedings, and informed said Chatfield in presence of said Leonard that said liquors were in the custody of the State, and that they had no right to take them.

The court further finds, that said liquors have never been returned by any of the respondents to said Forbes, or to said constable, or to the custody and jurisdiction of this court. The court also finds that no demand for such return has ever been made, nor had this court ordered the respondents to return the liquors before the commencement of these proceedings. Said liquors were taken and carried away as aforesaid on the 4th day of October, 1879, and before the 1st day of the October term of this court.

The court further finds, that all the averments in the answers of the respondents other than said Hurley, except so far as they admit the facts alleged in said application, and such as are found true in the finding of this court, are not proven; also that each of the respondents (except said Hurley), at the time of the acts by them committed had full knowledge that said liquors were held by virtue of a seizure process with a view to their condemnation, and that in taking and carrying them away they intended to prevent them from being adjudicated upon or condemned by this court.

The court decides and adjudges that John A. Hurley is not guilty of contempt of the court; it is therefore ordered that he be discharged. The court adjudges upon the foregoing facts that John H. McMahon, Peter W. Wren, Patrick J. Leonard and James M. Chatfield are and that each of them is guilty of contempt of this court; and it is ordered that the said McMahon pay a fine of one hundred dollars, and be imprisoned in the common jail at Litchfield, in said Litchfield County, for the term of sixty days; that said Wren pay a fine of one hundred dollars; that said Leonard pay a fine of sixty dollars, and be imprisoned in the common jail at said Litchfield for the term of thirty days, and that said Chatfield pay a fine of seventy dollars and be imprisoned in the common jail at said Litchfield for the term of thirty days; and that they and each of them be attached

of their bodies, and be committed to said common jail at said Litchfield, and be confined and imprisoned therein, till this order, judgment and decree is fully complied with, or until they and each of them be discharged by order of this court or otherwise by due process of law.

The respondents brought the record before this court by a motion in error.

*R. E. DeForest* and *A. H. Fenn,* for the plaintiffs in error.

*First.* The court erred in overruling the demurrer.

1. The acts alleged in the petition as having been committed by the respondents constitute no contempt of any court. The liquors were not in the custody of any court. Under the statute the seizure proceedings are simply a civil action. The State, as one party, claims them for the purpose of destroying them as a nuisance. The owners of the liquors, on the other hand, claim them, and deny and contest the title of the State. Here is an issue raised between these two parties as to the title to these liquors, which the courts are invoked to decide. In the meantime they are held by the constable on a warrant issued by a justice of the peace. The justice acts not judicially, but rather ministerially, precisely as he does in issuing a writ of attachment, or of replevin, or any other mesne civil process; and the officer who takes and holds the goods under this warrant holds them in no higher capacity than that in which he would hold the property attached or replevied, as the case might be. He is in a certain sense a bailee for both parties, responsible to both for the preservation of the liquors. If the liquors should ultimately be awarded to the State, he is then responsible to the State to produce them for destruction. If the court finally decides that they do not belong to the State, but to the other claimant, then the officer is responsible to the owner for their preservation and return. In the meantime, therefore, while they belong in a certain sense to both parties, they belong to no court in any sense. They are in the custody and subject to the control of no court. They are held by no officer of any court and by no warrant issued by any court. The subject of the controversy is as much at

the disposal of the parties as in any other civil suit. They may settle the case and dispose of the property accordingly, and the court cannot interfere. But it is suggested that this is an action *in rem;* that the liquor is the party—the very thing to be adjudicated upon; that without the liquor there is no case; that by forcibly removing the liquor from the hands of the officer the court has been deprived of its subject matter of jurisdiction, and that therefore it is an act of contempt. If this argument proves anything, it proves that any unlawful act to prevent a cause from coming on to trial in court is a contempt of that court; for instance, to kill a plaintiff, after suit brought and before trial, in a case where the death of the party operates to abate the action, this would be a contempt of court. The proposition will not bear a moment's examination.

2. The information is insufficient because the alleged contemptuous acts were not committed in *the presence of the court*, either actually or constructively. We confidently submit that on the facts shown no court has power to punish the respondents in the present case as for contempt. By careful examination of our statutes and decided cases it will be found that all the contempts, so called—that is, all offences which courts have power to take cognizance of as committed against their own dignity and without criminal jurisdiction, are embraced in two classes. The first class includes those cases where the power of the court is not, properly speaking, a punitive one, but simply the power of controlling its own officers and executing its own decrees. Such is the power to compel the attendance of witnesses, and incidentally to prevent all interference with such attendance. Such is the power to enforce orders of injunction, by fining or imprisoning those who having been enjoined refuse to obey. Such is the power to discipline attorneys at law, to fine sheriffs for not executing the court's orders, &c. And, assuming that the District Court had anything whatever to do with the custody of these liquors, and that they were taken by the respondents as alleged, then if the court, after the appeal had been entered, had ordered the respondents to return them and they had not obeyed, perhaps there would

have been some ground for claiming that the case fell within this first class. But no such order having been made, and therefore no order having been disobeyed or interfered with by the respondents, and they not having been officers of the court, the case clearly does not fall within this class, and if it exists at all must be found in the second class. The second class includes all contemptuous acts committed in the presence of the court, that is, in such a manner that the court can decide by the evidence of its own senses, and without the intervention of witnesses or other proof whether or not a contempt has been committed. In such cases the court can punish summarily and without the intervention of a jury. It may fine and imprison, not as a means of executing its decrees, not to regulate the conduct of its own officers, but by way of punishment, whether there has been any decree or order of the court to enforce or not, and whether the accused is an officer of the court or not. For example, insulting language addressed to the court, the court has power to take jurisdiction of, pass upon without evidence, and punish. This is merely the power which necessarily inheres in the court to preserve its own dignity and protect itself while in the actual discharge of business. And the power to punish summarily and without evidence is conceded, because the court saw the act and thus has knowledge of it without further proof. But this power to punish simply as punishment, and not by way of enforcing the orders of the court, or of restraining its own officers, exists, we contend, in no other cases. We deny that it exists even at common law. In all other cases the necessity for any such power ceases. While a court is in session, actually engaged in business, affrays, loud talking, and other like disturbances in its presence, unless they are summarily suppressed, actually prevent judicial proceedings. Therefore, upon the principle of self-preservation, the court is permitted to exercise a power not ordinarily belonging to it, and without delay or formality proceed criminally against the offending party. But where an act is committed at a distance, and perhaps, as in this case, long before the attention of the court is called to it, there is no such necessity. The offender may, if he has

been guilty of any misdemeanor, be informed against and tried and punished in the usual way. The plea of necessity can no longer be interposed. The court will be as much protected by the punishment of the offence in the ordinary way as though it were done summarily. " *Cessante ratione legis, cessat ipsa lex.*" Again, where offences are not committed in its presence there is no propriety in allowing the court to decide the issue of fact. Where the offence is committed in presence of the court, it has immediate knowledge of the fact, and there is no need of any further evidence or of any trial whatever. But not so here. Here there must be a trial; witnesses must be examined; the proceeding is criminal in its nature. If the accused is convicted, his property, his liberty, his character, are affected. In such a case the right of trial by jury ought not to be denied and the criminal thrown upon the mercy of a single trier, who, in vindicating his own dignity, can hardly be regarded as disinterested. Undoubtedly dicta can be found to the effect that acts committed by others than court officers not in the presence of the court, and not in opposition to or disobedience of any order of court, may be punished as contempts. But when the precedents from which such inferences are drawn are closely examined, we believe they will not warrant the conclusion claimed from them. In many of these cases it will be found that the prosecution was not summary, but upon regular information or indictment, and before a jury. And when the proceedings were summary, it will be found that the accused was some officer of the court, and so amenable to its authority ; or that the offence was in opposition to some order of the court; or that it had a direct tendency to obstruct the court in the actual discharge of public business, and was committed, if not actually, yet constructively, in the presence of the court. But whatever the rule at common law may be, we insist that under our statute the court had no power to punish in this case for contempt, on the facts alleged. The statute (Gen. Stat., p. 61, sec. 15,) is : " Any court may punish by fine and imprisonment any person who shall in its presence behave contemptuously or disorderly ; but no justice of the peace shall inflict a greater

fine than seven dollars, nor a longer term of imprisonment than thirty days; and no other court shall inflict a greater fine than one hundred dollars, nor a longer term of imprisonment than six months." It may be conceded that this statute leaves untouched and unaffected the power inhering in courts to enforce their own decrees and coerce their own officers, powers that arise out of an entirely different necessity, and stand upon an entirely different ground, from that claimed in this case. The offenses contemplated by the statute are those committed by any person, and not by an officer of the court. Here is a wide distinction. Where an officer of the court disgraces his office or disregards the obligations of his official position, the essence of his misbehavior is not that he does the act in any particular place, or that the act is of any particular kind, but that as an officer of the court he is under its government and subject to its rules and regulations at all times and wherever he is. On the other hand, the essence of the offense of " any person " referred to in the statute, is the positive commission of something which, from the peculiar circumstances under which it was committed, is derogatory to the rights and dignity of the court. Again, the offenses contemplated by the statute consist not of disobedience to or interference with any order of the court, but of contemptuous and disorderly behavior,— positive acts, rather than neglect or refusal. This class of cases, therefore, is clearly distinguished from all other acts, which may be either properly or improperly called contempts. In relation to this class, it is provided that courts may punish for them in certain cases and to a certain extent. It follows that for this class of contempts no court can punish to any greater extent or in any other cases. What extent? In the case of a justice court, $5 fine and thirty days imprisonment. In the case of a higher court, $100 fine and six months imprisonment. In what cases? When the offense is committed in *the presence of the court.* Could the court imprison for a year for any of these classes of offenses? It will not for a moment be claimed that it could. No more, we say, can it punish at all any one of this class of offenses, unless it is committed in its presence. Stated

in another form our view of the statute is this: The subject of the statute is that entire class of contemptuous acts which are not committed by officers of court or in disobedience to the court's orders; but which might be committed either in or out of the presence of the court; that in relation to this class, if at common law the courts had greater power, the statute has repealed the common law, and in place of it provided that courts may punish within certain limits whenever the offense is committed in their presence; that under the statute all offenses within this class not committed in its presence the court has no power to punish. If this is not the object and meaning of the statute, what is? Is it suggested that the object of the legislature was simply to regulate proceedings in cases where the contemptuous acts are committed in the presence of the court, and not in any way to affect those offenses committed out of its presence? If so, was it intended to confer on courts a power not possessed at common law? But this cannot be, for every one admits that at common law courts have power to punish contempts committed in their presence. If the object was not to confer power, then it must have been to restrain. But is it supposable that the legislature designed to limit the power to punish in cases of contempt committed in the presence of a court, and leave the power unlimited in cases not committed in its presence? What possible explanation could be offered for any such folly? To *limit* the court in its power to punish in such a case, and leave it *unlimited power* where the offense is not committed in its presence, and where it can know nothing about it but at second hand, and on the testimony of witnesses, and where, from the very fact of its not being in the presence of the court, it is necessarily less contemptuous, would be unaccountably ridiculous. We submit that our construction of the statute is the only one that can upon thorough consideration be rationally adopted. Now in *State* v. *Daley*, 29 Conn., 272, our court decided that a statute fixing the punishment for the crime of manslaughter so superseded the common law that no power remained in the court to convict or punish for that crime as a common

law offense.  Precisely so, we insist, has the statute under consideration superseded the common law.  As confirming the views here advanced we refer to some well-considered cases in other states.  In *Dunham* v. *The State*, 6 Iowa, 245, the court say (p. 254) :  " Our code declares that certain acts or omissions therein named are contempts and are punishable as such by the courts or any judicial officer acting in the discharge of an official duty.  The acts charged in this case, if punishable under the code, must be so as being contemptuous or insolent behavior toward the court while engaged in the discharge of a judicial duty which may tend to impair the respect due to its authority.  We think this clause has reference to some act or behavior in the actual or constructive presence of the court.  The use of the words ' behavior towards,' ' while engaged,' and ' in the discharge of,' would clearly seem to show that this was intended. Not, it is true, that the contemptuous and insolent behavior need be in the court room and under the eye of the court in order to amount to a contempt, but the court being in the discharge of its judicial duties, the guilty party, though not in its immediate presence, might do those things which would amount to a contempt.  But to make a party guilty under this claim the contempt or insolent behavior must be towards the court; the court must be engaged in the discharge of judicial duty, and this behavior must tend to impair the respect due to its authority.  It would be a perversion of the entire language used and a palpable violation of the spirit and policy of the provision to say that a judge could bring before him every editor, publisher or citizen who might in his office, in his house, in the streets, away from the court, by printing, writing, or speaking, comment on his decision or question his integrity or capacity.  The law never designed this.  If therefore the respondent did nothing more than comment, though never so severely, upon the action of the court, and though he may have published ever so fully, and whether truly or falsely, the proceedings upon the first hearing, we cannot think it would amount to a contempt under the first clause of the section under consideration.  It is insisted, however, that the courts of this

state may punish *other* acts and omissions as contempts than those *mentioned in the code.* We are strongly inclined to think, however, that the provisions of the code upon this subject must be regarded as a limitation upon the power of the courts to punish for any other contempts." See also *Ex parte Hickey,* 12 Miss., 751; *Lining* v. *Bentham,* 2 Bay, 1, 8; *Clarke* v. *May,* 2 Gray, 410; *Hollingsworth* v. *Duane,* J. B. Wall., 77; Niles's Civil Officer (10th ed.), 67.

3. Even if the acts alleged in the information were contemptuous, and even if those acts are punishable by some court, yet the acts can in no view of the case constitute any contempt of the District Court. There is no pretense that these acts were in disobedience of or resistance to any order or decree of that court. The sole ground on which it is claimed that it had any jurisdiction is that the liquors were held by a constable in a cause which was pending in that court at the time of the alleged offence. The information indeed alleges that when the offence was committed the cause was pending in the District Court. Of course, however, this naked statement does not aid the information, if from the facts stated in it it appears that the cause was not pending. From those facts we insist that this does appear. It is alleged that the case had been tried before a justice of the peace and an appeal taken from his decision to the District Court at its October term, 1879. The October term of the court commenced on the 6th day of October, 1879. The contempt, therefore, is alleged to have been committed before the term of court to which the appeal was taken had begun; before the case could have been entered in that court. We say that, upon these facts, the cause was in no sense pending in the District Court. That court had obtained no control over it; had no power to make any order in relation to it, or to the parties in it, or to the subject matter of it. It depended entirely upon the parties to the action whether the District Court ever should obtain any jurisdiction whatever in the cause. The owners of the liquors had indeed given a bond to enter and prosecute their appeal in that court, but they might, if they saw fit, refuse to do this and forfeit their recognizance. In the event that the appellant failed to enter

the appeal, the appellees might enter it during the first term. If neither party entered it, and until it had been entered, the case was not pending in court.   Nor had the court obtained any jurisdiction over it.   Such being the case, on the very face of the information the proceeding was *coram non judice*, and the court should have sustained the demurrer.  *People* v. *Brennan*, 45 Barb., 346; *People* v. *County Judge*, 27 Cal., 151; *Batchelder* v. *Moore*, 42 id., 412; *Lessee of Penn* v. *Messinger*, 1 Yeates, 2; *Moore* v. *Clerk of Jessamine*, 6 Little, 104; *Cheshire* v. *Atkinson*, 1 Hen. & Mun., 210; *Weaver* v. *Hamilton*, 2 Jones (Law,) 343; *Taliaferro* v. *Horde's Admr.*, 1 Rand., 242; *Funk* v. *Israel*, 5 Iowa, 452; *Ex parte Tillinghast*, 4 Pet., 108; *Brent* v. *Beck*, 5 Cranch C. C., 461; *Hewitson* v. *Hunt*, 8 Rich., 106; *McDermott* v. *Butler*, 10 N. Jer. Law R., 158; *Ex parte Grace*, 12 Iowa, 208.

*Second.*   The court having overruled the demurrer and required the respondents to file their answers, and the State's Attorney having traversed these answers, thus forming an issue of fact for trial, the respondents moved for a trial by jury.   This motion the court refused to allow.   If the respondents could be tried in this proceeding at all we say they had a clear right to be tried by a jury.   The proceeding is criminal in its nature.   The punishment is fine and imprisonment.   The decision is final.   There is no appeal.   Besides this, it being claimed that the offence was committed against the authority and dignity of the very court assuming jurisdiction, and to some extent therefore against the judge who presides in it, whatever theories counsel may indulge in such judge is practically an interested party.   Of all conceivable cases, therefore, it is the one in which such judge ought not to be permitted to decide the issues of fact.   It violates that fundamental principle of law and justice that no man should be allowed to be judge in his own case.   We have in this finding facts, which we perhaps are not permitted to say there was no evidence to support, but which are not alleged in the information or involved in the issue.   Such, for example, is the finding that the respondents took the liquors to prevent their being adjudicated upon by the District Court.   But whatever might be the case upon general principles, yet,

under our constitution, the respondents were entitled to a trial by jury. Two clauses of our constitution guarantee the right of trial by jury. The first provides that "in all criminal prosecutions and in all prosecutions by indictment or information, the accused shall have a right to a speedy public trial by an impartial jury." Now we have before alluded to the fact that proceedings for contempt are criminal in their nature. It is true that they are not so strictly criminal as to be within the jurisdiction of no court not having criminal jurisdiction, as the court decided in *Middlebrook* v. *The State*, 43 Conn., 257. But that they are criminal in their effect on the accused and in such a sense as to bring them within the spirit and purview of constitutional guarantees established for the protection of all who are criminally prosecuted, it appears to us none can deny. If then, within the meaning of this clause of the constitution this is a criminal proceeding, inasmuch as the prosecution is upon the information of the State's Attorney, we claim the right of jury trial on this ground. *Goddard* v. *The State*, 12 Conn., 454. Again, another clause of our constitution provides that "the right of trial by jury shall remain inviolate." This has been decided to mean that the right shall be allowed in all those cases in which it existed at the time of the adoption of our constitution. Now, we inquire, assuming that there could be any trial at all in a case like this, was there not a right at the time our constitution was adopted to a trial by jury? The constitution was adopted in 1818. In the edition of the statutes of Connecticut last published before that date we find a chapter on the subject of "delinquencies." The word "delinquencies" in that edition, and in many prior and subsequent editions, was used in place of the word "crimes," and as a word of exactly similar import. At the head of that chapter, page 142, we find this provision:—"That all persons prosecuted for any matter of delinquency before the superior or county court shall have liberty to be tried by a jury if desired." Now on the opposite page and under the same title we find this statute in relation to contempts. Contempts, therefore, were before the adoption of the consti-

tution recognized, classified and treated as delinquencies, and in relation to contempts together with other delinquencies, the express law of Connecticut declared that whenever persons charged with contempt were prosecuted in the superior or county court a trial by jury was of right demandable. The term "county court" in a constitution or statute applies not only to county courts then existing, but to all county courts which may afterwards be established. The district court is a county court. We claim, of course, as before, that the statute then existing, which is substantially the same as the one now on our book, prohibited a court from proceeding against parties for contempts in cases like this, unless they were committed in the presence of the court; but assuming that we are mistaken in this, then, we say, those other offences, being delinquencies as much as those mentioned in the statute and not falling within the class embraced in the statute, do come under the general provision relating to delinquencies, and under that provision were of right triable by jury. Thus, it appears that prior to the adoption of the constitution the right existed, and therefore is preserved in the section of that instrument now under consideration, and if it shall appear that in other states the law before the adoption of their constitutions was different, and men there could be fined and imprisoned at the caprice of a single magistrate in any court and to any extent for offences not committed in their presence, and the facts of which being disputed must necessarily be determined by trial, and ought upon every principle of fairness and justice to be tried by an impartial jury, we may congratulate ourselves that in Connecticut at least, such an abominable and oppressive doctrine was repudiated in the very infancy of our body politic.

*Third.* Assuming again that the court had jurisdiction of the matter, then we say the court erred in allowing the State to introduce evidence after the respondents had testified and purged themselves of the contempt, as appears of record. Judge Swift, (2 Digest, 382,) says: "The court will proceed to examine the party on oath, and if he fully purge himself on oath in his answers to the interrogations put to

him, the court will discharge him of the contempt and leave him to be prosecuted for perjury if it be thought proper." This rule is sustained by numerous authorities in this country and in England. Hawkins P. C., 214; 4 Black. Com., 288; *Murdock's case*, 2 Bland, 486; *Jackson* v. *Smith*, 5 Johns., 117; *U. States* v. *Dodge*, 2 Gall., 313; *Watson* v. *Fitzsimmons*, 5 Duer, 629; *Ex parte Noah*, 3 City Hall Recorder, 31; *Ex parte Van Hook*, id., 64; *Ex parte Strong*, 5 id., 8. Now when the State offered evidence to contradict the statements made by the respondents on oath, they had fully purged themselves of the alleged contempt, and were entitled to an immediate discharge. They had thus fully purged themselves by denying that they had done anything more than they supposed they had a legal right to do, and that they had intended no contempt of or disrespect to the court. "In modern times a man may purge himself of an offence in some cases, where the facts are within his own knowledge. For example, when a man is charged with a contempt of court, he may *purge* himself by *swearing* that in *doing the act charged, he did not intend* to commit a contempt." Bouvier's Law Dict., *Purgation*. It is therefore the contemptuous *intent* which constitutes the offense; and denying any such intent purges the accused of the contempt. If, however, we have so monstrous a doctrine in this country and age as that a man may be imprisoned for an act done with perfectly innocent intent, and in pursuit of what he conceived to be his legal rights, even then the court certainly had no power to hear evidence to contradict them, but could only punish them on the facts admitted in their disclosures.

*Fourth.* Aside from all objections to the jurisdiction of the court, and the mode of procedure adopted in this case, we submit that upon the facts found and apparent on the record, the respondents have done nothing which can properly be considered or legally punished as a contempt of court. The case was simply this: Certain liquors belonging to McMahon & Wren, had been seized at Winchester. On the hearing before the justice, they had claimed the

property, and taken an appeal from the judgment condemning it to destruction. The liquors had not been kept by the constable in his own possession, but had been delivered by him to a third person, who was in no sense an officer, or under the obligation of any bond for their preservation. Aware that under such circumstances the property, even in the event that the owners should eventually establish their right to its return, would be liable to great waste and diminution in quantity and value, and believing that pending the proceedings on the seizure process they could more effectually secure and preserve it themselves, they sued out a writ of replevin, by virtue of which the liquors were placed in their possession. For this great crime they have been treated as thieves and robbers, and the justice who issued the writ, and the deputy sheriff who served it, have with them been sentenced to fines and imprisonment. Did the respondents do anything more than they had a perfect right to do? Would replevin lie in such a case? The language of the statute, (Gen. Stats., p. 484,) certainly seems broad enough to include it. It must be conceded that the right to *bring* the action includes not only cases where the court finally *decides* that the plaintiff had a general or special property in the goods replevied, with a right to their immediate possession, and that when the action was brought they were wrongfully detained, but also cases where these facts can be and are claimed. Why, then, would replevin not lie? The goods were claimed by the plaintiffs in replevin as their property. They claimed a right to the immediate possession of them; they claimed that they were wrongfully detained. The statute says that in every case where the facts here claimed exist, the action may be *maintained.* Claiming these facts the plaintiffs in replevin certainly had a right to *bring their action* in the manner prescribed by law, and, if they were able, *prove* their claims and obtain judgment. If they failed to establish their claims, they were bound to restore the goods and pay all costs and damages, and the bonds they had given were more than sufficient security to the adverse party. To suggest that they incurred any other liability,

civil or criminal, in thus pursuing their legal rights—that in case they should fail to establish the claims which they lawfully made in their action, they could be fined and imprisoned—seems to us a reproach to the law, and an insult to common sense. It may be suggested, however, that upon the facts found the respondents were charged with the legal knowledge that they could not maintain their action, and that therefore they are chargeable as for instituting a groundless and malicious prosecution. But any such assumption is false. McMahon & Wren, it is true, knew that the goods were originally seized on a warrant issued in seizure proceedings, and it is found that Leonard and Chatfield were so informed. It does not follow, however, from this, that the action of replevin could not be maintained. Our opponents say that the goods, when they had been seized, were in the custody of the law. So, we say, are goods taken by an officer on an execution. So is property taken by a tax collector on his warrant. But cannot replevin be maintained in such cases, and have not our courts so repeatedly decided? Once the statute giving the action of replevin used the words "*unlawfully* detained." Then, perhaps, the action could not be maintained for property taken on execution and on tax warrant. But since the language has been changed to *wrongfully* the rule is different. But it is claimed that in the peculiar circumstances in which this property was situated, the owner could not legally bring the suit. They at least *supposed* that they could bring it. The justice *supposed* it was his *duty* to issue the writ and endeavored to perform that duty. The officer *supposed* it to be obligatory upon him to serve the process and acted under that belief. These facts, which if not expressly found, the law, in the absence of contrary proof, will presume, ought certainly to acquit the respondents of contempt. There may, perhaps, be cases where a party thinking an order of injunction or other order of court illegal, and that therefore he was not bound to obey, has willfully disobeyed and has been held guilty of contempt. It is in such a case, if in any, that we find an occasional dictum to the effect that ignor-

ance or mistake of the law does not excuse a party for contempt; but it never can be tolerated in a government of freemen that men, in the absence of any order of court, seeking their rights in a manner which they supposed was authorized by law, and officers of the law acting in good faith in what they supposed was the discharge of official duty, should for this be dragged before a court, arraigned as criminals, denied a trial by jury, compelled to testify against themselves, and finally·condemned to infamous punishment. *State* v. *Harvey*, 14 Wis., 151; *Watson* v. *Fitzsimmons*, 5 Duer, 630.

*C. B. Andrews* and *J. Huntington*, contra.

CARPENTER, J. The facts of this case are briefly these: Certain liquors were seized with a view to condemnation under the statute. Two of the respondents, McMahon and Wren, appeared before the magistrate and claimed the liquors, and, being unsuccessful, appealed to the District Court. After the appeal, and before the session of the appellate court, they obtained from one of the other respondents, who was a magistrate, a writ of replevin, by virtue of which another respondent, who was an officer, took the liquors by force from the officer in whose custody they were and delivered them to the claimants, McMahon and Wren. The present proceedings were instituted by the State's Attorney with a view to the punishment of the parties concerned in the issuing and serving the writ of replevin for a contempt. The District Court found the facts and rendered judgment against the respondents, and the record is brought before us by a motion in error.

There was a demurrer to the complaint which was overruled. The insufficiency of the complaint is still insisted on, on the ground, as it is claimed, that the acts alleged do not constitute a contempt of any court, especially the District Court; and for the reason that the liquors were not in its custody, and the acts not committed in its presence, and that the appealed case against the liquors was not then pending before that court.

First in importance perhaps, if not first in regular order, is the question whether the cause was pending before the District Court.

A trial had been had before the magistrate and a judgment rendered. After that, certainly the case was not pending before the magistrate. If no appeal had been taken the judgment would have ended the case and it would not have been pending anywhere. The appeal vacated the judgment and the case revived. In its resurrected form however, it was not remitted to its former position—a case before the magistrate, but it at once entered upon a higher scale of existence. The appeal transferred the case *instanter* to the jurisdiction of the District Court. That court for the purpose of acquiring jurisdiction of new cases is always in existence. Jurisdiction in point of right does not at all depend upon the actual sessions of the court, but attaches as soon as an appeal is taken or an ordinary process served. That is more apparent perhaps in those states and jurisdictions where processes returnable to the court must issue from the court itself. Our practice of allowing any magistrate to issue writs returnable to the higher courts does not vary the principle. It is familiar to the profession in this state that a suit is regarded as pending as soon as legal service is made on the defendant. For the same reason it must be regarded as pending before the appellate court as soon as the appeal is taken. The right of the court to entertain jurisdiction of the cause, unless it is otherwise disposed of by the parties, is then complete, and no other tribunal can interfere with it. The fact that as a matter of convenience, practice, and law, the court will take no action until the session of the court, does but affect the question of right. The cause was therefore pending immediately after the appeal, and as it could be pending in no other court it was pending in the District Court.

But it is said that the liquors were not in the custody of that court. If by this is meant that they were not in the actual physical custody of the judge or of some officer by him appointed, or that they were not held by order of that court,

we shall have no occasion to controvert the assertion; but if it is intended to say that the liquors were not held after the appeal subject to the orders of that court, we cannot assent to it, for it is very clear that they were so held. In. that sense therefore and for that purpose they must be regarded as constructively at least in the custody of the court. The fact that they were in the actual possession of a constable of the town makes no difference, as the constable was but the agent of the law, and the law held them that they might be disposed of as the District Court might direct.

It is further said that the acts complained of were not committed in the presence of the court; and the statute regulating the punishment of that class of contempts is referred to. It is said that the statute is exclusive, and practically abolishes all other common law contempts, with two exceptions presently to be noticed; and that inasmuch as the statute does not reach this case the respondents cannot be punished in this proceeding at all. Confessedly the statute deals only with acts of contempt committed in the presence of the court, and where no process is required to bring the offender into court. It leaves all other cases of contempt to be ascertained and punished according to the course of the common law.

It is conceded by the learned counsel for the respondents that there are two classes of cases in the nature of contempts which are not covered by our statute and which are summarily punished by our courts; and these are misconduct of the officers of the court and disobedience to the orders and decrees of the court. The principal difference between these and statutory contempts is, that in the former, process is required to bring the party into court, and the acts or omissions constituting the offense are to be proved as in ordinary cases by the introduction of witnesses; while in the latter the offender is ordered into custody without process and the judge may act upon his own knowledge.

The power to enforce by attachment its own orders and decrees necessarily inheres in every court of record, and that power has been repeatedly exercised by the Superior Court in this state with the sanction of this court. *Lyon* **v.**

*Lyon*, 21 Conn., 185; *Rogers Manufacturing Company* v. *Rogers*, 38 Conn., 121; *Tyler* v. *Hamersley*, 44 Conn., 393. This is not denied.

The present case presents the question whether the court has power to protect its own jurisdiction over a case before trial, against the unlawful acts of a party who would be benefited by defeating that jurisdiction. For it must be admitted that the acts of the respondents tended directly to destroy the jurisdiction of the District Court, and doubtless that was the object in view. That is apparent from the nature of the proceeding. It was a proceeding *in rem.* Without the custody, actual or constructive, of the thing proceeded against, the court could have no jurisdiction and all its proceedings would be nugatory. Now it is not to be tolerated in a civilized and enlightened community that a party interested in defeating the ends of justice should have it in his power by force and violence to take away the jurisdiction of the court. That this is attempted to be done under the forms of legal proceeding is an aggravation, and calls upon the court to be astute not to allow its process to be used for any such purpose. We come then to the inquiry whether the principles of the common law and precedents in this state or elsewhere will justify the court in protecting its jurisdiction by proceedings as for a contempt.

A case is referred to in Salkeld arising during the reign of Henry the Seventh, in which a party attempted to proceed in the lower court after the cause had been legally removed into another jurisdiction. In 1 Anst., 212, Eyre, Chief Baron, gives a very interesting description of the proceedings. "The roll of the 19th of Henry the Seventh, to which I alluded, and which is referred to in Salkeld, and is there supposed to be a precedent for removing an action and for granting an attachment, because the party after service of the order took upon himself to proceed, was in truth a proceeding as for an immediate contempt, for levying a plaint in a court at Bristol for a parcel of wine that had been seized and prosecuted to condemnation in this court, and it was a very orderly proceeding. The Attorney-General states it as a matter of complaint against the party; there is a capias

awarded; he is taken into custody; he is brought into court; is committed for the contempt to the Fleet; he is brought up again; makes fine to the court; his fine is regularly recorded; and then upon the ground of the fine he is dismissed."

. It is probably true that courts were more arbitrary at that early day and governed less by forms and principles prescribed by the written law than are our own courts; and in a case like that we should probably find a less harsh but equally effective remedy by an injunction, or by treating the proceedings in the lower court as a nullity. In the case before us, however, no other remedy seems to be adequate. An injunction could not prevent the acts, for it would not ordinarily be known in season that they were contemplated. The acts could not be treated as a nullity, for the liquors were thereby taken from the custody of the court. It is suggested that the court might have ordered the respondents to return the liquors. That might or might not have been a remedy. In many cases it would not be. The party and the liquors might be without the territorial jurisdiction of the court; or, by reason of sales or otherwise, it might be impossible to trace and identify the liquors. The case referred to, however, is important as showing how jealously the court at that day guarded and protected its own jurisdiction.

The case in 1 Anst., 212, arose under the revenue laws. The language of the Chief Baron is pertinent to the present case. After the part quoted above, he proceeds as follows:— "In this they evidently proceeded upon a general analogy to the proceedings in other courts; for there is no court that suffers its process either to be insulted or to be materially interrupted; and whenever this is attempted it is a contempt upon which the courts proceed to grant an attachment in the first instance. *　　* But that this jurisdiction was not a very novel thing, nor this a single instance, we may collect from other cases that are very clearly established, namely, that if a man at this day, there being a seizure in order to condemnation, was to presume to replevy the goods, it would be a contempt of the court for which an attachment would be granted instantly; so if a distress is taken upon a

fee farm rent or other duty to the crown, it is considered as a contempt to replevy and an attachment will issue upon it."

The case of *Riggs* v. *Whiting*, 15 Abb. Pr. Reports, 388, was an application to the court to direct a receiver to pay the landlord from rents collected of under-tenants before distribution to creditors. It was objected that the landlord should be left to a suit against the receiver. The court, after approving the course taken, say:—"Any attempt to deprive an officer of the court of property in his possession, by suit or other adverse proceeding, without first obtaining leave of the court, would be regarded as a willful contempt, for which the party instituting the proceeding would subject himself to punishment by attachment."

In *Richards* v. *the People*, 81 Ill., 551, the court holds that " a receiver is an officer of the court, and that his possession is the possession of the court itself, and any unauthorized interference therewith, either by taking forcible possession of the property committed to his charge, or by legal proceedings for that purpose without the sanction of the court appointing him, is a direct and immediate contempt of court and punishable by attachment."

The same doctrine is found in *Cochrane* v. *Mead*, L. Reps., 20 Eq. Cases, 282.

These authorities are sufficient perhaps to show that whenever courts acquire jurisdiction over property and hold it subject to judicial proceedings they will not suffer their possession to be unlawfully disturbed, or quietly submit to being deprived by unlawful means of their power to proceed; but will protect that jurisdiction by the summary process of attachment for contempt. Property attached in an ordinary civil suit stands upon a different ground. The attachment merely creates a lien upon it in favor of the judgment that may be obtained. It is in no sense a proceeding *in rem.* The jurisdiction of the court does not depend at all upon the possession of the property, but does depend upon the parties and the subject matter. Hence the defendant may cause the property to be receipted, or the attachment dissolved by substituting a bond, without affecting the jurisdiction of the court.

Our conclusion upon this part of the case is, that the same

principle which governs courts in enforcing their decrees will justify the use of all necessary means to protect their jurisdiction in order that they may pass decrees. A proceeding for contempt is an effectual means to that end.

That the act of the respondents was a contempt is sufficiently shown, unless they are right in their claim that the statute gave them a right to an action of replevin.

The statute is, that "the action of replevin may be maintained to recover any goods or chattels, in which the plaintiff has a general or special property with a right to their immediate possession, and which are wrongfully detained from him in any manner," &c.

It is claimed that the property was wrongfully detained, or that they in good faith supposed that it was, and that they had a right to try the question in this way. We do not think the word "wrongfully" was used in such a sense as to cover a case of liquors seized under the statute. If there was probable cause for believing that the liquors had been forfeited under the law, and we must assume that there was, the statute authorized a process by which they might be seized and held to await a judicial determination of that question. That being so, it can in no just sense be said that the officer who held it held it wrongfully. Even property attached, if liable to attachment, cannot be replevied by the owner if he is the defendant in the suit. It is only where property of a stranger to the suit is attached that replevin will lie. Here there can be no pretense that the property of the wrong person was taken. It is not the ownership by any particular person that gives a right to seize it, but it is the purpose for which it is being used without regard to ownership.

Again, the claimants had no right to the immediate possession of the property. Such a right would be wholly inconsistent with the power of the court to condemn it. The replevin suit therefore could not be maintained. See authorities cited above; also *Allen* v. *Staples*, 6 Gray, 491.

It is further claimed that the respondents, having been examined as witnesses under oath, and having testified that they acted in good faith and intended no disrespect to the

court, thereby purged themselves of the contempt, and that no further proceedings could thereafter he had against them except a prosecution for perjury. That may be the practice in some jurisdictions, but we agree with the Supreme Court of New Hampshire, that the better practice is to receive other testimony and settle the whole question of contempt in one proceeding. *State* v. *Matthews*, 37 N. Hamp., 450. And such we understand to be the practice in this state. There is no error in this respect.

It is also claimed that the court erred in refusing to allow a trial by jury. We are not aware of any case in this state or elsewhere in which it has been held that a party accused of contempt is entitled to a trial by jury. The contrary has been repeatedly held. *State* v. *Matthews*, 37 N. Hamp., 450; *Oswald's Case*, 1 Dallas, 319; *State* v. *Becht*, 23 Minn., 411; *State* v. *Doty*, 32 N. Jer., 403; *Crow* v. *The State*, 24 Texas, 12. It would seem to be necessary that the court should have the power to judge of all questions of this nature. The power to protect the dignity of the court might hang by a slender thread if it was made subject to the uncertainties of a jury trial.

It is true the proceeding is summary, and in some measure arbitrary, but no special inconvenience is likely to result from it. Parties can always have the assistance of able counsel, who will be vigilant and zealous in their behalf; every right-minded judge will bear in mind that it is not his private and personal dignity but the dignity of the law and of the state that is in his keeping, and will be disposed to act fairly and impartially; and if these fail, there is public sentiment, which is quick to perceive and prompt to challenge any abuse of power, and which would speedily find expression, if need be, in the passage of a remedial statute.

The judgment of the court overruling the demurrer was not a final judgment, and the respondents were not at that stage of the case entitled to a motion in error. Gen. Statutes, p. 450, sec. 14.

There is no error.

In this opinion the other judges concurred.