CHARLES H. WILSON, *Petitioner,* vs. R. T. JOUGHIN, Sheriff of Hillsborough County, Florida, *Respondent.*

Case No. 3.

141 So. 178.

En Banc.

Opinion filed April 26, 1932.

Petition for rehearing denied July 8, 1932.

*Dickenson & Lake,* for Petitioner;

*Charles F. Blake,* for Respondent.

BUFORD, C.J.—This is a proceeding in habeas corpus brought by Charles H. Wilson to procure his discharge from custody under a judgment of contempt entered by the Honorable L. L. Parks, one of the Circuit Judges of the Thirteenth Judicial Circuit of Florida, in and for Hillsborough County.

The Rule to Show Cause issued to Wilson contained the following allegation:

"That from the said testimony the said Henry A. West testifies that you, the said Charles H. Wilson, did on the night of Saturday, February 27th A. D. 1932, or during the early morning hours of Sunday, February 28th A. D. 1932, approach the said Henry A. West, after the said Henry A. West had been duly served with summons to appear as a Juror, knowing that he was a juror drawn to serve in this court during the week beginning February 29th A. D. 1932, and knowing that the aforesaid case of the State of Florida v. Victor Palmer, et als., was to be called for trial during that time, and attempted to corrupt the said juror, to-wit: Henry A. West, by offering or promising a gift or gratuity, to-wit: the sum of One Hundred Dollars if the case resulted in a mistrial, or the sum of Two Hundred Dollars in the event the case resulted in an acquittal, with the intent to bias the opinion and influence the decision of such juror relating to the cause pending in the court, and thereby corrupt, hinder and obstruct the administration of justice in the Court aforesaid, contrary to the statutes of the State of Florida, and in contempt of this Court and the Judges serving therein."

The testimony attached to and made a part of Rule Nisi shows that one Henry A. West, testified as follows:

"Judge Parks: Now. Mr. West, Judge Parkhill has not had any opportunity to talk with you about this case and he has not heard anything except what you testified to out there. I want you now to be just as

frank and candid and state just as carefully as you can the whole transaction in answer to the Judge's questions.

THE WITNESS: I don't want it understood that I came up and gave it voluntarily, but that I am forced to.

THE COURT: You are under the process of the court.

THE WITNESS: Saturday night I went home and went to bed about 10 o'clock and I judge it was about 11:30, it was between 11:30 and 12 o'clock, the 'phone rang. My mother has had some spells at different times and my wife's mother has been sick at times, and the minute that the 'phone rings I just imagine that something has happened. And I went to the 'phone and the fellow said, 'This is Charley Wilson', and he said 'Big Old Charley Wilson, the jailer.' I see him hanging down around Rawlins filling station on Florida Avenue. And he said 'I want to talk to you.' · And I said 'I am in bed and sleepy' and he said 'I have a boy here right now and will be over in a couple of minutes, and I won't take but a minute of your time.' It didn't occur to me that this thing was coming up because I had figured that I was not going to be here this morning. I was going to get my boy to come up here and tell my wife to make a mistake and give it to the wrong Henry A. West. And after these men came up he came out there and said first, 'I am having trouble with my rheumatism again' and he came in and sat down and I turned the lights on. It was in the living room and I was in the front ·with him. And he first said that he had had trouble with his rheumatism and that Drane had arranged for him to go back out to Hot Springs to be boiled out, to take the treatment. And he said, 'By the way, I have got a friend that is going to be tried next week up there and I hate like the devil to see that fellow hang.' I knew that they had electrocution instead of hanging and I said, 'I am not even going down there on the jury, besides I have got my wife to give this to my boy and he is going down.' And he said, 'Where is he?' And I didn't tell him where

he was because I didn't want him to find him. I told him I didn't think I would go, I was scheduled to take the American Steel & Wire Salesman to go down through the mine Monday to work. And he said, 'Of course, I believe he has been a bad egg, and I would like to see him get some time, and I don't think they ought to turn him loose, but I hate like hell to hang him.' And he got up to go out of the door and he said, 'In case it is a mistrial it is $100 and if it is an acquittal it is $200.' I was sleepy and didn't get my wits. I went back to the room and said to my wife, 'The dirty son of a bitch figures that I am that kind of a man' and I said 'My boy is just 21 years old and $200 will look like two million to him and they will get that boy and get him in a mess. I am going to arrange for somebody to take my run and I am going to face the music and go down and go into this thing because I don't want to throw the temptation.'

I went down Sunday afternoon and took the summons away from my boy and said, 'I have decided to stay in town.' I didn't tell him anything about what had come up. He was there just two or three minutes, there was not any money shown.

MR. PARKHILL: Q. Did your wife see him?

A. No sir. She was back in bed.

Q. Could she hear him? A. No, sir.

Q. How long have you been knowing this fellow Wilson?

A. Ten or fifteen years.

Q. See much of him? A. He used to be jailer and hangs around Archie Rawlin's filling station, and he waited on my car several times, and he mentioned, 'I don't want to get in any trouble about this thing, but I would just love to help the boy if I could,' and as he got up to go out of the door he made that money proposition.

Q. Was he drinking? A. No, sir, he was sober and dressed up and had a nice clean shirt and coat on and had a walking cane and somebody outside was with him. I didn't have my shoes on.

Q. That is practically all that took place? A. Yes. sir.

Q. You could not think of anything else to throw any light on this matter? A. No sir.

MR. SUTTON: Q. We should have asked Mr. Ash and also this man Hunter, did you see what kind of a car Wilson came up there in? A. No sir.

MR. SUTTON: That is one thing we should ask Mr. Ash also.

A. He told me that he was going to see three or four other fellows and one of them is a railroad man. He said, 'I am going to see three or four fellows and one of them is a railroad man, about this same thing.'

Q. Did he say who he was working for?

A. I knew that old man Wilson has been living on a pension and didn't have any money to pay it.

Q. Did Wilson tell you anything that you could conclude who sent him there? A. No sir, he said that he knew Wilbur Leavine—I mean knew this Leavine boy, and I said, 'As far as I know, I don't know as I have ever seen him, I might know him if I would see him but I don't know as I have ever seen him.' So I went over to see Mr. Cooper to get him to let Geiselman to take my run because he is sales manager, and he said, 'They are stacking the jury on Parks, Parks ought to know this.' And I said I didn't want to get mixed up in this, you and I have been friends and business associates for years, and he said all that he could go was to throw this out and draw it over, so he called your house and you were in church and he said to come back at two o'clock and he would go back down there with me. Cooper is the man that told you.''

To this Rule Wilson answered under oath as follows:

''This respondent denies that he, at any time, ever offered the said Henry A. West the sum of One Hundred Dollars if the case resulted in a mistrial, or the sum of Two Hundred Dollars in the event the case resulted in an acquittal, referring to the case of the State of Florida vs. Victor Palmer et als.

This respondent further says, that if any statement which he made to the said Henry A. West was construed by the said Henry A. West to mean an attempt to corrupt the said Henry A. West by offering

or promising a gift or gratuity to-wit: the sum of One Hundred Dollars if the case resulted in a mistrial, or the sum of Two Hundred Dollars in the event the case resulted in an acquittal, that there was no intention on his part to make such an offer or attempt to corrupt the said Henry A. West.

Further answering said Rule to Show Cause, this Respondent says, that he did at the time of the meeting as set forth in the Rule to Show Cause, between himself and the said Henry A. West, believing prior to his departure from said meeting that the said Henry A. West would not be present in Court on February 29th, 1932, to serve as a juror in the case of the State of Florida vs. Victor Palmer et als. or any other case to be tried in the Circuit Court of Hillsborough County, Florida.

This Respondent further answering said Rule to Show Cause, says that said Rule to Show Cause is vague and indefinite and uncertain, and that he made no such statements as alleged to have been made by him in the said Rule to Show Cause, or rather the material statements alleged to have been made by him.''

The question presented here was not presented in the case of Ex Parte Earman, 85 Fla. 297, 97 Sou. 775, nor in the case of Ex Parte Biggers, 85 Fla. 322, 95 Sou. 763. Here the language and conduct attributed to Wilson by West in his sworn testimony before the Circuit Judge was unambiguous and amongst reasonable men could have but one meaning and that was that Wilson intended West to understand that if he, West, could get on the jury and a mistrial should result that West would get $100.00 and that if an acquittal resulted West would get $200.00. This conduct, if indulged in by Wilson was a clear and unambiguous attempt to interfere with the orderly process of justice and to corrupt a proposed juror and to obstruct the court in its administration of law.

The only question presented for our consideration beyond the question as to whether or not the alleged

language and conduct of Wilson was ambiguous is whether or not the answer of Wilson under oath denying the allegations of the Rule entitles him to discharge.

The law, as we think it should be applied to the case at bar was stated by Mr. Justice Holmes in the case of the United States vs. Shipp, 203 U. S. 563, 51 L. Ed. 319, in which it is said:

"Another general question is to be answered at this time. The defendants severally have denied under oath in their answer that they had anything to do with the murder. It is urged that the sworn answers are conclusive; that if they are false the parties may be prosecuted for perjury, but that in this proceeding they are to be tried, if they so elect, simply by their oaths. It has been suggested that the court is a party and therefore leaves the fact to be decided by the defendant. But this a mere afterthought, to explain something not understood. The court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case. On this occasion we shall not go into the history of the motion. It may be that it was an intrusion or perversion of the canon law, and is suggested by the propounding of interrogatories and the very phrase 'purgation by oath' (juramentum purgatorium). If so it is a fragment of a system of proof which does not prevail in theory or as a whole; and the reason why it has not disappeared perhaps may be found in the rarity with which contempts occur. It may be that even now, if the sole question were the intent of an ambiguous act, the proposition would apply. But in this case it is a question of personal presence and overt acts. If the presence and the acts should be proved there would be little room for the disavowal of intent. And when the acts alleged consist in taking part in a murder it cannot be admitted that a general denial and affidavit should dispose of the case. The outward facts are matters known to many and they will be ascertained by testimony in the usual way. The question was left

open in Re Savin, 131 U. S. 267, 33 L. ed. 150; 9 Sup. Ct. Rep. 699, with a visible leaning toward the conclusion to which we come, and that conclusion has been adopted by state courts in decisions entitled to respect. Huntington v. McMahon, 48 Conn. 174, 200, 201; State v. Matthews, 37 N. H. 450, 455; Bates Case, 55 N. H. 325, 327; Re Snyder, 103 N. Y. 178, 181, 8 N. E. 479.; Crow v. State, 24 Tex. 12, 14; State ex rel. Mason v. Harper's Ferry Bridge Co., 16 W. Va. 864, 873. See Wartman v. Wartman, Taney, 362, 370, Fed. Cas. No. 17, 210; Cartwright's case, 114 Mass. 230; Eilenbecker v. District Court, 134 U. S. 31, 33 L. ed. 801, 10 Sup. Ct. Rep. 424. Whether or not Rev. Stat. #725, U. S. Comp. Stat. 1901, p. 583, applies to this court, it embodies the law so far as it goes. We see no reason for emasculating the power given by that section, and making it so nearly futile as it would be if it were construed to mean that all contemners willing to run the slight risk of a conviction for perjury can escape.''

In a note following the opinion in the case of O'Flinn vs. State, in 9 L. R. A. (N. S.) p. 1119, the author said:

''The weight of authority may be said to hold that, in cases of constructive or indirect criminal contempt, if the contempt consists of acts or statements which are ambiguous in character, and which are capable of two constructions, one of which would amount to contempt and the other not, so that the intent of the party himself becomes the material question of ininquiry, then a denial on oath by such party of an intent to show disrespect to the court is conclusive, and cannot be disputed. So, also, where intent in reference to the contempt charged is the gravamen of the offense, a denial of the intent under oath, will purge the contempt. Where, however, the conduct or language used is subject to but one reasonable construction, and that is that contempt was intended, or where intent itself is not the gravamen of the contempt charged,—then a denial of intent under oath will not be conclusive.''

This conclusion of the author is followed by the discussion of numerous cases with citations which it is

not necessary for us to repeat here because the author's note as above cited is available to the bench and bar. Suffice it to say that it appears to us that the enunciation of the law, as stated by the author, could be couched in no more definite and succinct language than that used and as he has cited in his note abundant authority to support the conclusion reached, we adopt it as the expression of this Court as a statement of law applicable to the case at bar. We hold that this conclusion is not in conflict with the opinion and judgment in the cases of Ex parte Earman, supra, or Ex parte Biggers, supra, when considered in connection with the facts in those cases and is not in conflict with, but is in entire harmony with the opinions and judgments in the cases of Wilson vs. Joughin and of Baumgartner vs. Joughin, filed at this term of the Court, in both of which a different state of facts existed.

For the reasons stated, the petitioner should be remanded to the custody of the Sheriff to execute the judgment of the Circuit Court under which he is held. It is so ordered.

Petitioner remanded.

WHITFIELD, ELLIS, TERRELL, BROWN AND DAVIS, J.J., concur.