[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION FOR CONTEMPT
In November of 1995, this court granted injunctive relief against Waste Management and entered the following orders: "Waste Management of Connecticut, Inc., is ordered to apply to the Connecticut DEP and any other appropriate state agencies for a CT Page 710 permit to remove all waste in whatever form in excess of the 90 foot height limitation, within 10 days from the date of this order." Brickley v. Waste Management of Connecticut. Inc., Superior Court, judicial district of Litchfield, Docket No. 60522 (November 7, 1995, Gill, J.), aff'd sub nom, Bauer v. WasteManagement of Connecticut, Inc., 239 Conn. 515, 686 A.2d 481
(1996). Additionally, in December of 1995, after hearing a motion for stay pending appeal, this court further ordered: "The motion for stay pending appeal is denied. The defendant is ordered to apply to the DEP and other local, state or federal agencies for the necessary permits to remove the debris in excess of the zoning regulation immediately." Brickley v. Waste Management ofConnecticut, Inc., Superior Court, judicial district of Litchfield Docket No. 60522 (December 8, 1995, Gill, J.)
Presently before the court is the plaintiff's motion for contempt based on the defendant's failure to comply with the above orders. The court held a hearing on the motion for contempt on November 5, 1997, and has reviewed the parties' post-hearing briefs and the voluminous record presented at the hearing. Additionally, the court has considered a piece of evidence that became available after the hearing, specifically, a letter from the DEP to Waste Management. In short, for the reasons articulated below, this court finds the defendant in contempt.
The plaintiff contends that the defendant has failed to act in good faith because it failed to submit or submitted incomplete applications to the Connecticut Department of Environmental Protection (DEP) and has represented to the DEP that the proposed plan for removal should not be approved because it will not comply with federal, state and local agency regulations. The plaintiff specifically relies on a letter signed by counsel for the defendant which was sent to the DEP along with the application to disrupt and relocate solid waste in the New Milford location. The letter provides, in pertinent part: "WMCT respectfully submits that this disruption plan describes a program for reducing the height of the landfill to 90 feet with the least amount of environmental impact that is possible under the circumstances. The plan employs technically sound pollution control technologies and mitigation measures. The expense of implementing the plan has not been a consideration in its preparation. The technical team has attempted to mitigate adverse environmental impacts. However, the environmental professionals who have prepared this application have concluded that this disruption will result in a variety of unavoidable and CT Page 711 uncontrollable environmental impacts and risks, principally from the emission of landfill gases, to the health and safety of those conducting the disruption and those living in the vicinity of the landfill during the disruption and will not provide an environmental benefit to the community or the State. . . . Should the DEP grant this application WMCT must reserve its right to seek judicial review, as an aggrieved party, from that decision. Nothing in this application is intended to constitute a waiver of WMCT's appeal of the Superior Court's Order or of the company's right to seek judicial review of any order or action of the Superior Court or the DEP." (Plaintiff's Exhibit H.)
Additionally, the plaintiff relies on the 1996 annual report of the parent company of Waste Management of Connecticut, Inc., WMX Technologies, Inc., as evidence of the defendant's failure to act in good faith. The annual report provides in pertinent part: "Although a lower court had declared the zoning ordinance's height limitation unconstitutional, during 1995 the Connecticut Supreme Court reversed this ruling and remanded the case for further proceedings in the Superior Court. In November 1995, the Superior Court ordered the subsidiary to apply to the DEP for permission to remove all waste above the height allowed by the zoning ordinance, and the Connecticut Supreme Court has upheld that ruling. The company believes that the removal of such waste is an inappropriate remedy and is seeking an alternative resolution to the issue, but is unable to predict the outcome. Depending upon the nature of any plan eventually approved by applicable regulatory authorities for removing the waste, the actual volume of waste to be moved, and other currently unforeseeable factors, the subsidiary could incur costs which would have a material adverse impact on the Company's financial condition and results of operation in one or more future periods." (Plaintiff's Exhibit AA.)
Additionally, the defendant's submission to the DEP indicates that "off site disposal facilities have not yet been identified. Use of off-site disposal facilities will require regulatory approval within the appropriate jurisdiction." (Plaintiff's Exhibit A, Attachment E p. 2.) As to off-site disposal, approximately two weeks prior to the hearing before this court, Waste Management identified an off-site location in New York (Plaintiff's Exhibit II, Appendix A) but claims it cannot apply for necessary permits until it knows how much waste will be removed from the New Milford site and deposited at the off-site facility. CT Page 712
The defendant, in its submission to the DEP, has identified several other areas where permits will be necessary including, but not limited to, "air permits and odor control" permits or modification to existing permits, "groundwater discharge" permit or modification to existing permit, "solid waste permit," "stormwater management" permit, "New Milford Excavation Permit," and "New Milford Wetlands Permit." (Plaintiff's Exhibit H pp. 41-42.) The defendant has failed to apply for these permits beyond the application filed with the DEP and has failed to make formal application to the Town of New Milford but has been advised that the proposed plan to alter the side slope of the existing landfill will be rejected by the town.
The proposed waste disruption plan to remove waste deposited between March of 1993 and September of 1995 is expected to take approximately eight years. (Plaintiff's Exhibits H and II.) The proposed time for the removal is repeated throughout various documents submitted at the hearing in this matter and was confirmed by the testimony of the witnesses.
As to the overall consistency of the plan, Waste Management's application to the DEP reads in pertinent part: "The disruption of the New Milford Landfill will not be consistent with the State Solid Waste Management Plan." (Emphasis in original.) (Plaintiff's Exhibit AA, Attachment E.) The statement then outlines the various consistency problems including impacts on the environment such as increased discharge of leachate to ground and surface waters, increased truck traffic and loss of capacity of the existing landfills.
Overall, the court notes that it was almost one year after injunctive relief was ordered in this case before Waste Management submitted the application to the DEP in September of 1996. Some of the shortcomings of the plan have been addressed and corrected by Waste Management, and the DEP, which rejected the initial filing for insufficiency, has indicated that Waste Management's application is now sufficient. (Letter dated November 14, 1997 addressed to Mr. Spooner of Waste Management from David Nash of the DEP.) The DEP has also noted that the notice letter does not "preclude the Department from requesting additional information concerning [the] application. It is not uncommon for questions to arise during technical review which will require additional information to resolve. The Department will make every effort to work with you to resolve any such CT Page 713 issues. Your prompt response to any requests for additional information will expedite the processing of your application." (Letter dated November 14, 1997 addressed to Mr. Spooner of Waste Management from David Nash of the DEP.)
"The court's authority to impose civil contempt penalties arises not from statutory provisions but from the common law.Potter v. Board of Selectmen, supra, [174 Conn. 195], 197 [,384 A.2d 369 (1978)]; Welch v. Barber, 52 Conn. 147, 156 (1884);Huntington v. McMahon, 48 Conn. 174, 196 (1880). The penalties which may be imposed, therefore, arise from the inherent power of the court to coerce compliance with its orders." Papa v. NewHaven Federation of Teachers, 186 Conn. 725, 737, 444 A.2d 196
(1982).
"The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril. . . . [A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings. . . . The duty to obey the injunction exists however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. . . ." (Citations omitted.) Cologne v. WestfarmsAssociates, 197 Conn. 141, 147, 496 A.2d 476 (1985). "We emphasize again that the court orders must be obeyed; there is no privilege to disobey a court's order because the alleged contemnor believes that it is invalid." Id., 148.
"To find a party in contempt, a trial court must conclude that a party has disobeyed an order of the court." Fitzgerald v.Fitzgerald, 16 Conn. App. 548, 551, 547 A.2d 1387, cert. denied,210 Conn. 802, 553 A.2d 615 (1988). "[A] wilful failure to comply with an outstanding court order may constitute a civil contempt."Marcil v. Marcil, 4 Conn. App. 403, 405, 494 A.2d 620 (1985). "The United States Supreme Court aptly has observed that `[t]he absence of wilfulness does not relieve from civil contempt . . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.' McComb v.Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497,93 L.Ed. 599 (1949)." (Citations omitted.) DeMartino v. Monroe LittleLeague, Inc., 192 Conn. 271, 279, 471 A.2d 638 (1984). CT Page 714
However, "`[a] finding of contempt depends upon the facts and circumstances surrounding it.'" Marcil v. Marcil, supra,4 Conn. App. 405, quoting Dukes v. Durante, 192 Conn. 207, 228,471 A.2d 1368 (1984). "`The inability of . . . [a] defendant to obey an order of the court, without fault on his part, is a good defense to a charge of contempt.'" Turgeon v. Turgeon, 190 Conn. 269,283, 460 A.2d 1260 (1983), quoting Tobey v. Tobey, 165 Conn. 742,746, 345 A.2d 21 (1974); see also Calway v. Calway,26 Conn. App. 737, 743-44, 603 A.2d 434 (1992) (holding that "the act for which the penalty was imposed cannot constitute contempt if the actor was unable to obey the order"). "The burden of proving such inability lies with the delinquent party." Leslie v. Leslie,174 Conn. 399, 403, 389 A.2d 747, motion to set aside judgment denied, 174 Conn. 759, 378 A.2d 1080 (1978), citing 17 Am.Jur.2d, Contempt, § 51.
"Contempts of court may also be classified as either direct or indirect, the test being whether the contempt is offered within or outside the presence of the court. . . . A refusal to comply with an injunctive decree is an indirect contempt of court because it occurs outside the presence of the trial court. . . . The question then becomes how conduct, alleged to be in contempt of a court order, that occurred outside of the trial court's presence is proved to be a contempt. Established principles of both constitutional and common law, we note, are implicated in this question." (Citations omitted.) Cologne v. WestfarmsAssociates, supra, 197 Conn. 150.
"[T]here are constitutional safeguards that must be satisfied in indirect contempt cases. It is beyond question that due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. . . ." (Citations omitted.) Cologne v.Westfarms Associates, supra, 197 Conn. 150.
"If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires . . . that the accused be accorded notice and a fair hearing. . . ." (Citations omitted.) Cologne v.Westfarms Associates, supra, 197 Conn. 151. "Due process requires, therefore, that one accused of indirect contempt be CT Page 715 accorded a `fair hearing,' and this includes the presentation of competent evidence in order to prove as a fact the occurrence of the alleged contemptuous conduct." Id.
"Further, at common law a charge of indirect contempt of court, in the absence of an admission of contempt, had to be proved by sufficient competent evidence, including testimony under oath. . . ." (Citations omitted.) Cologne v. WestfarmsAssociates, supra, 197 Conn. 151. "Therefore, if the conduct alleged to be contemptuous occurred outside of the court's presence, as it did in this case, the court can only act upon evidence properly taken that proves the act of contempt. 17 C.J.S., Contempt § 84 (4) and cases cited therein; 17 Am.Jur.2d, supra, §§ 83, 88, 95 through 99; Dobbs, supra, § 2.9. As we have stated: Where the alleged contempt does not occur in the presence of the court and is thus defined and punishable under the common law, process is required to bring the party into court, and the acts or omissions constituting the offense are to be proved as in ordinary cases." Id., 152. "[T]he evidence necessary to constitute the alleged contempt must have been established by sufficient proof in the trial court. . . ." (Citations omitted.) Id.
In the present case, the defendant was afforded these constitutional safeguards. There was a one day hearing at which testimony and evidence were offered and heard.
Contempts may be characterized as either civil or criminal.[1] "[A] criminal contempt is conduct that is directed against the dignity and authority of the Court." Board ofEducation v. Shelton Education Assn., 173 Conn. 81, 85,376 A.2d 1080 (1977). "In criminal contempt the sanction is punitive in order to vindicate the authority of the court. . . . Consistent with this principle, punitive fines levied in criminal contempt are usually payable to the state." (Citations omitted.) Id.
"In contrast, civil contempt is conduct directed against the rights of the opposing party. . . . Sanctions for civil contempt may be either a fine or imprisonment; a fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained." Board ofEducation v. Shelton Education Assn., supra, 173 Conn. 85; see also DeMartino v. Monroe Little League. Inc., supra,192 Conn. 278-79 (holding that "civil contempt is conduct directed against the rights of the opposing party. A contempt is considered civil CT Page 716 when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent against the public. . . .") (Citations omitted.) "In civil contempt the fine must be conditional and coercive, and may not be absolute."Board of Education v. Shelton Education Assn., supra,173 Conn. 85. "[T]he contempt is civil when the fine is conditional and coercive and when the contemnor can obtain release from the sanction by compliance with the judicial decree." McTigue v. NewLondon Education Assn., 164 Conn. 348, 353, 321 A.2d 462 (1973). "To effectuate the purpose of civil contempt, the contemnor should be able to obtain release from the sanction imposed by the court by compliance with the judicial decree. . . ." (Citations omitted.) Cologne v. Westfarms Associates, supra, 197 Conn. 157.
"The evaluation of civil contempt penalties depends to a great extent on whether the penalties are considered at the time they are first conditionally imposed for the purpose of coercing compliance or are considered after the contempt has been purged and the penalties are finalized. When the penalties are first imposed, the propriety of the court's exercise of its discretion turns on the reasonableness of the amount of the coercion that the court deems necessary, keeping in mind the court's ultimate power to reduce the penalties once the contempt has been purged. We cannot say in this case that the fact that the court simultaneously imposed two forms of conditional penalty to coerce compliance amounted to an abuse of discretion. It may be a better practice, as the defendants suggest, for the court to impose civil contempt penalties in increasingly harsh stages so as to increase the pressure on the contemnor." Papa v. New HavenFederation of Teachers, supra, 186 Conn. 738.
"The line of demarcation between criminal and civil contempt proceedings is in many instances indistinct and even imperceptible. A useful test, however, is the punishment imposed. When the punishment is purely punitive, imprisonment for a definite term or a fine for a certain sum of money, the contempt is said to be criminal. When the punishment is a remedial or coercive measure, commitment of a contumacious party until he complies with the mandate of the court or a fine until there is obedience to the court's order, the contempt is said to be civil." Board of Education v. Shelton Education Assn., supra,173 Conn. 85-86.
In United States v. Mine Workers, 330 U.S. 258, 303-304,67 S.Ct. 677, 91 L.Ed. 884 (1947), the court explained that CT Page 717 "[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. . . . Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss. . . . But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired. It is corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant." (Citations omitted.) Id.
"The penalty to be imposed rests in the discretion of the court . . . It should be adapted and determined with regard to the circumstances, character, and extent of the violation. . . ." (Citations omitted.) O'Neill v. Carolina Freight CarriersCorporation, 27 Conn. Sup. 389, 390, 239 A.2d 693 (1967); see also Dole Fresh Fruit Co. v. United Banana Co., Inc.,821 F.2d 106, 108 (2d Cir. 1987) (explaining that before imposing a fine, the court must consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him").
For example, in United States v. Mine Workers, supra,330 U.S. 304-05, the court found the defendants to be in both criminal and civil contempt. The Supreme Court modified the judgment and ordered "the defendant union to pay a fine of $700,000, and further, to pay an additional fine of $2,800,000 unless the defendant union, within five days after the issuance of the mandate herein, shows that it has fully complied with the temporary restraining order issued. . . ." Id., 305. The court explained that "[w]e well realize the serious proportions of the fines here imposed upon the defendant union. But a majority feel that the course taken by the union carried with it such a serious threat to orderly constitutional government, and to the economic and social welfare of the nation, that a fine of substantial size CT Page 718 is required in order to emphasize the gravity of the offense of which the union was found guilty." Id., 305-06. The court concluded that "[p]unishment in this case is for that which the defendants had done prior to imposition of the judgment in the District Court, coupled with a coercive imposition upon the defendant union to compel obedience with the court's outstanding order." Id., 307.
The theme of Waste Management's correspondence and application to the DEP, not to mention its dilatory tactics, demonstrate to this court that Waste Management has wilfully disobeyed the orders of this court. Testimony of the witnesses only reinforced the tenor of Waste Management's disobedience. The court recognizes that the remedy in this case is complex, but it also recognizes Waste Management's constant representations, both explicit and implicit, that the disruption plan is doomed to fail only points out the problems and fails to speak to the solutions. Waste Management is aware of the fact that the town will not approve the increase in the side slope of the existing waste yet offers no other solution and insists on beating a path to failure.
This court finds that the failure of this project to date is due to the wilful actions of Waste Management in failing to attempt to posit a plan that is workable but still removes the tonnage in excess of the 90 foot height limitation imposed by the town's zoning ordinance. When asked by this court whether the project was "doable" Mr. Collison[2] answered "Yes." (HT p. 134.)[3] Although the court recognizes Waste Management's attempt to be honest regarding the environmental impacts of disruption of the New Milford facility, it also recognizes the fact that Waste Management has failed to apply for certain permits it was ordered to apply for over two years ago. It is for precisely this failure on Waste Management's part that this court finds the defendant in civil contempt.
The court is well aware of the fact that Waste Management cannot control how long it will take for the various administrative agencies to review the applications for the necessary permits and recognizes that the application to the DEP is presently on review. What Waste Management can control and has failed to control is the filing of applications for permits to all the agencies necessary for this disruption plan to work.
The court finds that Waste Management has failed to file an CT Page 719 application form for a ground water discharge permit. Waste Management has also failed to apply for a permit with an out-of-state agency for redisposal of waste removed from New Milford. In Waste Management's "Application For Modification To Solid Waste Permit 096-1M", dated August 1997, it noted that an off-site disposal facility had not been identified and failed to complete the information until October 31, 1997. (Plaintiff's Exhibit AA, Appendix E.) Furthermore, Waste Management's original submission to the DEP indicated that more than one off-site disposal facility would in all likelihood be necessary. (Plaintiff's Exhibit H p. 19.) To date, only one facility has been identified and the necessary permit application has not been submitted. The only document produced was a letter Waste Management wrote to the New York State Department of Environmental Protection which is nothing more than a request for consideration of the New York site as a potential disposal site. (Plaintiff's Exhibit II, Appendix A.)
Waste Management represented that it could not apply for a permit for out-of-state disposal because it would require contractual negotiations which cannot begin until Waste Management knows the tonnage to be removed, the time frame and duration of the project. According to Waste Management, none of the information will be available until the Connecticut DEP completes its review and the Town of New Milford approves a side slope variance. At the present time, Waste Management knows approximately what tonnage will be removed and the estimated time frame and duration of the project. The defendant, therefore, should apply for a permit with the state of New York and any other potential out-of-state facility. Waste Management should also apply for any local permits it has identified as necessary. Mr. Heidtman testified that the application for local permits should be deferred because he "wouldn't know what to apply for in terms of a local permit at the moment." (HT p. 144.) Waste Management's proposed plan calls for redistribution of the existing mass and this requires a permit from the town of New Milford. Although the town, through counsel, has indicated that Waste Management's proposal would violate New Milford's zoning ordinance, that does not prevent Waste Management's filing of an application. Waste Management knows enough about the estimated excavation to apply for a permit.[4]
Waste Management, through Mr. Collison, claims that it does not "believe" it will be able to obtain a variance or waiver of the United States Environmental Protection Agency's emission CT Page 720 guidelines. Although the court recognizes the testimony provided by Waste Management's environmental team, the court orders the defendant to apply for the permits so as to confirm or refute its "belief."
The defendant argues that the plaintiff has failed to demonstrate that Waste Management's failure to apply for collateral permits has slowed the DEP's consideration of the disruption plan or prejudiced the plaintiff in any other way. The court is not persuaded by this argument. Waste Management's failure to apply for collateral permits is in direct contravention of this court's orders. If the application to the DEP is any indication of how long it may take to obtain collateral permits, the defendant has only extended that time by more than two years in failing to take the steps to obtain the collateral permits.
The court recognizes that the DEP has found the application of Waste Management to be sufficient. Accordingly, the court, although it finds the defendant in contempt, will give the defendant the opportunity to purge itself of contempt. The defendant is ordered to prepare and submit all additional applications for permits within sixty (60) days from the date of this memorandum or the defendant will be fined $500,000 per day for each day Waste Management fails to comply with this court's orders both past and present. The court finds that a fine of substantial size is required in order to emphasize the gravity of Waste Management's failure to comply with the November 7, 1995 and December 7, 1995 orders of this court and to coerce the defendant into action. This is particularly true in view of the fact that the defendant received $50 million for this illegal deposit of waste and its parent company receives revenues of $10 billion annually. For the sake of specificity, the defendant is to file for permits outlined on pages 39 through and including 42 of its "Solid Waste Disruption Plan for the New Milford Landfill" dated September 1996. (Plaintiff's Exhibit H.) Waste Management is also ordered to file an application for a permit for the out-of-state facility identified in its submissions to the DEP as discussed above.
As to the plaintiff's request that the court order the defendant to deposit a cash bond in the amount of $108 million with the Clerk of the Litchfield Superior Court, the court agrees with the defendant that such a measure would be punitive and beyond the scope of a remedy available in the case of civil CT Page 721 contempt. As discussed fully above, the remedy in the case of civil contempt is a fine, imprisonment or both.
The plaintiff also seeks an order of this court that the defendant pay further civil penalties pursuant to General Statutes § 8-12[5] for the period of September 20, 1995 through September 22, 1997, for the defendant's continuing violation of the Zoning Regulations. Although the court finds the defendant in contempt, it also recognizes that the defendant has no control over how long approval of the permit process will take. This court assessed civil penalties in the form of a fine in accordance with the General Statutes § 8-12 at $100 per day for every day from the date the landfill was in violation of the zoning ordinance, which in this case was March 1993, up to and including the day this court ordered a temporary injunction stopping Waste Management from further violation, which was September 19, 1995. The defendant paid this penalty and cannot begin to remove waste until the required permits are obtained. Because this court finds that such a remedy would be punitive in nature, the court denies the plaintiff's request to impose civil penalties post judgment.
The plaintiff also seeks attorney's and officer's fees in this contempt action in the amount of $22,053.30. General Statutes § 52-256b provides in relevant part: "(a) When any person is found in contempt of any order or judgment of the Superior Court, the court may award to the petitioner a reasonable attorney's fee and the fees of the officer serving the contempt citation, such sums to be paid by the person found in contempt."
"Additionally other principles may be pointed out. It has been well-said that [n]o one can state the reasonable value of legal services as a fact. He can only express his opinion. The value is based upon many considerations. Hoenig v. Lubetkin,
supra, [137 Conn. 516], 524, [79 A.2d 278 (1951); Piantedosi v.Floridia, 186 Conn. 275, 279, 440 A.2d 977 (1982). The ultimate decision is for the court. Even where expert opinion is offered, and none has, that is not binding on the court. . . ." (Citations omitted.) Bank of Boston Connecticut v. Brewster,42 Conn. Sup. 474, 504, 628 A.2d 1354 (1992), aff'd, 32 Conn. App. 215,628 A.2d 990 (1993).
"In any event, an applicant for attorneys' fees is only entitled to an award for time reasonably expended and the amount CT Page 722 of time actually expended does not necessarily equal the time reasonably expended. Blum v. Stenson, 465 U.S. 886, 897,104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); Hensley v. Eckerhart, supra,461 U.S. 424, [433-34], 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983);National Assn. of Concerned Veterans v. Secretary of Defense,675 F.2d 1319, 1326 (D.C. Cir. 1982); Riddell v. National DemocraticParty, 545 F. Sup. 252, 257 (S.D.Miss. 1987)." Bank of BostonConnecticut v. Brewster, supra, 42 Conn. Sup. 504.
"It should be pointed out that the United States Supreme Court has said that while `the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate' is `[t]he most useful starting point for determining the amount of a reasonable fee'; Hensley v. Eckerhart, 433; it has also said that `[t]he product of reasonable hours times a reasonable rate does not end the inquiry'; id., 434; because `there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high.'Blum v. Stenson, 897. `The court has few duties of a more delicate nature than that of fixing counsel fees.' Hoenig v.Lubetkin, supra, 525." Bank of Boston Connecticut v. Brewster, supra, 42 Conn. Sup. 504-05.
"Courts have stressed the need to submit proper time records. In this regard it has been said: `The party seeking fees has a duty to submit detailed and contemporaneous time records to document the hours spent on the case. A simple after-the-fact tally is not sufficient. Copies of the actual time records should be submitted.' Denton v. Boilermakers Local 29, 673 F. Sup. 37, 53
(D.Mass. 1987); see also Calhoun v. Acme Cleveland Corporation,801 F.2d 558, 560 (lst Cir. 1986); Grendel's Den v. Larkin,749 F.2d 945, 952 (lst Cir. 1984); Wojtkowski v. Cade, 725 F.2d 127,130-31 (1st Cir. 1984)." Bank of Boston Connecticut v. Brewster, supra, 42 Conn. Sup. 505.
"A court is not required to accept an attorney's valuation of his own time. . . . The party seeking fees may introduce evidence of the prevailing market rates in the community. . . . The circumstances that a party may not oppose a fee requested does not divest the court of the power to determine what a reasonable fee is and to allow only that amount. . . . Stated another way: Even where there has been no objection to the size of the attorney's fee requested, it is the responsibility of the court to see to it that the size of the award is reasonable. . . ." CT Page 723 (Citations omitted.) Bank of Boston Connecticut v. Brewster, supra, 42 Conn. Sup. 505-06.
The affidavit of attorney's fees submitted by the plaintiff details the work done in preparation of the motion for contempt including court time. As the defendant argued, many of the entries are, however, not detailed enough for this court to determine whether the action taken was related to the motion for contempt, nor can the court determine which attorney performed which task such that it can apply different billable rates as set forth in the affidavit attached to the billing statement. The court reviewed the billing statement and finds the following entries are clear enough for this court to award attorney's fees and will combine the hourly rate of the attorneys ($175 per hour for Attorney McKenna and $185 per hour for Attorney Sienkiewicz) to reach a billable hourly rate of $180:
Date Description Hours
 Sep. 4, 97 Preparation of Memorandum in support of motion for contempt 3.00
 Sep. 10, 97 Preparation of Memorandum in support of motion for contempt 3.10
 Sep. 11, 97 Preparation of Memorandum in support of motion for contempt 2.40
 Sep. 12, 97 Preparation of Memorandum in support of motion for contempt 1.80
 Sep. 17, 97 Preparation of Memorandum in support of motion for contempt 5.00
 Sep. 22, 97 Preparation of Memorandum in support of motion for contempt 2.20
 Sep. 23, 97 Preparation of Memorandum in support of motion for contempt 3.10
Sep. 23, 97 Preparation of motion for contempt 1.60
 Sep. 28, 97 Receipt/review correspondence Telephone call with Greg Druback, Tim Hollister 0.70 CT Page 724
Oct. 31, 97 Draft subpoena; attention to same 0.40
 Nov. 03, 97 Preparation of statement of contested facts 2.80
 Preparation of statement of contested facts; receipt and review of proposed exhibits 4.20
 Nov. 04, 97 Preparation for trial and statement of facts; legal research 7.20
Nov. 05, 97 Appearance in court 7.50
Appearance in court 7.50
Nov. 06, 97 Post trial brief 4.70
Nov. 07, 97 Post trial brief 3.20
Nov. 10, 97 Post trial brief 4.50
Nov. 11, 97 Post trial brief 5.20
Nov. 12, 97 Finalize Post trial brief 1.70
 Total hours 71.80 Attorney's fees 71.80 times 180 = $12,924.00 Costs 46.80
The defendant is ordered to pay attorney's fees and costs in the amount of $12,970.80.
In summary, the court finds the defendant in civil contempt for its failure to comply fully with this court's previous orders. If the defendant did not understand the orders of this court and required clarification, it had ample opportunity to seek clarification. The court ordered the defendant to apply for the necessary permits with the DEP and any other local, state or federal agencies. The plan submitted to the DEP outlines the permits that would be necessary yet Waste Management has failed to so much as begin the application process for the collateral permits. For this reason, the court finds that it must act so as to coerce the defendant into action but gives the defendant sixty CT Page 725 (60) days from the date of this memorandum to purge itself of contempt. Failure to apply for the permits outlined above within the sixty day time period will result in the imposition of a fine in the amount of $500,000 per day. The court concludes that a coercive imposition upon the defendant is necessary to compel obedience with the court's previous orders. In reaching this conclusion the court has considered "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." Dole Fresh Fruit Co. v. United Banana Co., Inc.,821 F.2d 106, 108 (2d Cir. 1987). Furthermore, the defendant is to pay the plaintiff attorney's fees and costs in the amount of $12,979.80.
BY THE COURT,
GILL, J.